**UNITED STATES of America,**
**Plaintiff,**

**v.**

**PHILLIPS PETROLEUM COMPANY**
**and Tidewater Oil Company,**
**Defendants.**

**Civ. No. 66–1154–F.**

United States District Court,
C. D. California.

Nov. 13, 1973.

Melvin J. Duvall, Jr., William S. Farmer, Jr., David T. Alexander, Shirley Z. Johnson, Antitrust Div., Dept. of Justice, San Francisco, Cal., for plaintiff.

O'Melveny & Myers, Everett B. Clary, Los Angeles, Cal., Sullivan & Cromwell, William Piel, Jr., John Dickey, Richard E. Carlton, New York City, Lloyd G. Minter, S. E. Floren, Bartlesville, Okl., for defendant Phillips Petroleum Co.

Brobeck, Phleger & Harrison, Moses Laskey, C. B. Cohler, San Francisco, Cal., Hays, Landsman & Head, C. Lansing Hays, Jr., New York City, R. D. Copley, Jr., Los Angeles, Cal., for defendant Tidewater Oil Co.

## OPINION

FERGUSON, District Judge.

This civil antitrust action was commenced on July 13, 1966, when the government filed its complaint alleging that the purchase of the Western Manufacturing and Marketing Division of the defendant Tidewater Oil Company by the defendant Phillips Petroleum Company violates § 7 of the Clayton Act as amended, 15 U.S.C. § 18.[1]

1. Section 7 of the Clayton Act, as amended, provides in pertinent part:

"[N]o corporation . . . shall acquire the whole or any part of the assets

At the time of the filing of the complaint, Phillips and Tidewater each engaged in the acquisition of oil and gas lands; the production of crude oil, natural gas and natural gas liquids; the manufacture of refined petroleum products; and the transportation and marketing of crude oil and products derived therefrom. Both were "corporations engaged in commerce" within the meaning of § 7 of the Clayton Act.

■ The court holds that where objective factors indicate that the market is highly concentrated with high barriers to entry, the acquisition of the seventh largest company in the market, with a 6–7% market share, by a likely potential entrant, which ranks tenth in the national market, is illegal under § 7 of the Clayton Act. The court finds that the acquisition produced a substantial lessening of competition through Phillips' elimination as a potential competitor, both through the removal of the likelihood that it would enter the market unilaterally in the future and through the elimination of the procompetitive influence it exerted from its presence on the edge of the market.

### Product and Geographic Markets

The parties have agreed that the relevant line of commerce under § 7 is the sale of motor gasoline, and that the relevant "section of the country" is the State of California. The term "market" shall be used to denote the sale of motor gasoline in California.

### The Government's Contention

The only respect in which the government contends that the acquisition may substantially lessen competition in violation of § 7 of the Clayton Act involves potential competition in the sale of motor gasoline in California. The government does not contend that actual competition, in the sense of existing competition between Phillips and Tidewater or between Phillips and other companies, was affected by the acquisition.

### The Acquisition

The Tidewater assets acquired by Phillips for $366 million on July 14, 1966 consisted of a refinery at Avon, California, which had a rated operating capacity of 135,000 barrels per day and manufactured a full line of refined petroleum products; 13 product terminals; 219 bulk plants for local distribution of products; approximately 3,250 service stations displaying the Tidewater brand name (Flying A); the capital stock of Seaside Oil Company, a wholly owned subsidiary of Tidewater which marketed motor gasoline under its own brand name through some 400 service stations, primarily in California; transportation facilities related to the operations of Tidewater's Western Marketing and Manufacturing Division, such as pipelines and five tankers; Tidewater's office building in Los Angeles; and Tidewater's inventory of crude oil, products, material and supplies on hand at the transfer date. In addition, Phillips acquired certain contractual rights to crude oil produced by Tidewater from its California oil fields. Although the 3,250 Tidewater brand service stations were scattered throughout California, Oregon, Washington, Hawaii, Idaho, Nevada and Arizona, the great majority were on the West Coast—in California and west of the Cascade Mountains in Oregon and Washington. This area accounted for 90% of Tidewater's motor gasoline sales in the Western states, with California alone accounting for 79% of such Western sales. Approxi-

of another corporation . . . where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The complaint was filed and these proceedings were instituted under § 15 of the Clayton Act as amended, 15 U.S.C. § 25. Venue rests with this court by reason of the fact that at the time of the filing of the complaint, Tidewater maintained its principal office and transacted business within the Central Division of the Southern District of California, now the Central District of California.

mately 2,200 of the 3,250 Tidewater brand stations were located in California.

Of the approximately 3,650 combined Tidewater and Seaside service stations obtained by Phillips from Tidewater, about 2,100 were owned or leased by Tidewater or Seaside, while the others were "contract resellers" which sold motor gasoline under the Tidewater or Seaside brand name pursuant to contractual arrangements. About 1,600 of the approximately 2,550 Tidewater and Seaside stations in California were owned or leased by Tidewater or Seaside. Of these 1,600 stations, about 1,400 operated under the Tidewater brand and the remainder under the Seaside brand.

### The Acquiring Company

Phillips is a corporation organized and existing under the laws of the State of Delaware, with its principal office located at Bartlesville, Oklahoma. Phillips began as a small Oklahoma crude oil producer in 1917, with assets of $3,000,000 and 27 employees. By the company's own admission, it has "grown into a giant and assumed a place of leadership in both the petroleum and chemical industries." At the time of the Tidewater acquisition, Phillips had assets of over $2,000,000,000, ranking among the eight largest domestic oil companies in the nation in assets. It ranked tenth among the domestic majors in gross sales ($1.46 billion in 1965) and ninth in net income ($127.7 million in 1965). In terms of operating indicators, Phillips ranked eleventh among the domestic majors in refining capacity, with about 3% of total domestic capacity. It ranked eighth in liquid hydrocarbons production, with 2.7% of total domestic production. At the time of the Tidewater acquisition, Phillips had six domestic refineries with total operating capacity of approximately 293,000 barrels per day.[2]

### The Acquired Company

At the time of the filing of the complaint, Tidewater was a corporation organized and existing under the laws of the State of Delaware. Getty Oil Company owned over half the capital stock of Mission Development Company, which in turn owned over half the capital stock of Tidewater. On September 30, 1967, Tidewater and Mission Development Company were merged into Getty Oil Company.

Tidewater marketed on both the East and West Coasts. It had total assets of approximately $1,000,000,000 at the end of 1965, ranking fifteenth among the domestic majors. It also ranked fifteenth in gross sales ($834 million), sixteenth in net income ($56 million), and fourteenth in both domestic refining capacity (260,000 barrels per day) and domestic net petroleum production (140,000 B/D). Its domestic motor gasoline sales totaled approximately 100,000 barrels per day.

Tidewater's share (including Seaside) of motor gasoline sales in California was 6.8% in 1965. This represented a decline from 9.9% in 1960 and 7.8% in 1963. The Tidewater brand accounted for about 5.7% of 1965 motor gasoline sales, and Tidewater's Seaside outlets accounted for an additional 1% of the California market. Tidewater ranked seventh in motor gasoline sales in California in 1965 and had ranked fourth in 1960. It ranked fourth in refining capacity in California in 1965 and third among California refiners in California net petroleum production.

At the end of 1965, Tidewater (including Seaside) owned or had a leasehold interest in 1,949 operating service stations. Of these, 1,454 were in California, representing a decline from 1,650 California stations in 1960. In addition, 891 other service stations in 1965 purchased Tidewater's branded gasolines and resold them, representing a decrease from 1,019 in 1961.

2. Additional facts about Phillips are detailed in the section on "Phillips' Capability of Entry" infra.

Between 1960 and 1965, the volume of Tidewater's sales of branded motor gasoline in California (including Seaside) declined by a proportion of 13.2% while total sales of motor gasoline of all sellers in California increased by 26%.

At the end of 1964, Tidewater had proved domestic reserves of crude oil and field condensate estimated at more than 650,000,000 barrels. At the time of the filing of the complaint, Tidewater's Delaware refinery had a crude oil operating capacity of 125,000 barrels per day, and its Avon, California, refinery had a capacity of 135,000 barrels per day. The Avon refinery accounted for about 10% of California refining capacity in 1966, and for 8.6% of West Coast capacity. The combined capacity of the two refineries amounted to approximately 2.6% of the total operating capacity of all domestic refineries.

### The Market

The California market for motor gasoline sales was the largest and fastest-growing motor gasoline market in the United States at the time of the acquisition. For several years prior to the filing of the complaint, including 1965, there were more motor vehicle registrations and motor gasoline consumption in California than in any other state. In 1965 there were 9.9 million motor vehicle registrations in California, about 4 million more than in New York, which ranked second. The California figure constituted 11% of the total motor vehicle registrations in the United States.

California ranks first among the states in population, total personal income, number of motor vehicles, number and sales of service stations, and gasoline consumption. California has experienced the largest absolute amount of increase in each of these categories during recent years and has been among the leading states in percentage increases.[3]

California motor gasoline sales contain the highest percentage of sales of premium grade gasoline of any state, amounting to 60.4% of California sales in 1970. Premium grade gasoline commands a higher selling price and a higher profit margin than regular grade.

Moreover, the California motor gasoline market could not be characterized as saturated. On a per-service-station basis, California ranked first among six key states in 1967 in the number of registered motor vehicles (566), the dollar volume of yearly sales ($134,552), and the number of gallons sold (25,528 per year). Although it has a large number of stations, California can support the opening of new ones.

### Section 7 of the Clayton Act and Potential Competition

In detailing and interpreting the legislative history of § 7 of the Clayton Act as amended, the Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 315, 82 S.Ct. 1502, 1518, 8 L. Ed.2d 510 (1962), stated:

> "The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy. . . ."

The greater the degree of market concentration, "the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge." United States v. Aluminum Co. of America, 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964). See also United States v. Philadelphia National Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The Supreme Court has construed § 7 to be aimed at

---

3. The state ranking second behind California often is substantially below it. For example, New York was second to California in total dollar sales of gasoline service stations in 1967 (the latest year for which figures are available), with $1.4 billion as compared with California's $2.6 billion. Texas ranked second in gasoline consumption in 1970 (the latest year available), with 6.0 billion gallons as compared with California's 9.1 billion gallons. Similarly, second-ranking New York had 6.7 million motor vehicle registrations in 1970 while California had 11.9 million.

"preserving the possibility of eventual deconcentration," *Aluminum Co. of America, supra,* 377 U.S. at 279, 84 S.Ct. at 1289; *Philadelphia National Bank, supra,* 374 U.S. at 365 n. 42, 83 S.Ct. at 1742. "It is the basic premise of [§ 7] that competition will be most vital 'when there are many sellers, none of which has any significant market share.'" *Aluminum Co. of America, supra,* 377 U.S. at 280, 84 S.Ct. at 1289.

The Supreme Court stated in *Philadelphia National Bank, supra,* 374 U.S. at 370, 83 S.Ct. at 1745, that "corporate growth by internal expansion is socially preferable to growth by acquisition." Section 7 was designed not only to arrest monopolistic practices after they are in full swing but "to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." S.Rep. No. 1775 and No. 2734, 81st Cong., 2d Sess., in 1950–52 U.S.Code Cong. & Admin.News 4295–98. As the Supreme Court pointed out in *Brown Shoe, supra,* 370 U.S. at 317, 82 S.Ct. at 1520, § 7's "provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency" was "a keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration." And in United States v. Penn-Olin Chemical Co., 378 U.S. 158, 170–171, 84 S.Ct. 1710, 1717, 12 L.Ed.2d 775 (1964), the Court observed:

"The grand design of the original § 7, as to stock acquisitions, as well as the Celler-Kefauver Amendment, as to the acquisition of assets, was to arrest incipient threats to competition which the Sherman Act did not ordinarily reach. It follows that actual restraints need not be proved."

■ Thus, § 7 prohibits the elimination of potential competition as well as of actual competition through an acquisition of stock or assets. The language of the statute prohibits acquisitions whose effect "may be" substantially to lessen competition; the government is not required to show either that it "would be" their effect or that they "have" that effect. Section 7 "look[s] not merely to the actual present effect of a merger but instead to its effect upon future competition," United States v. Von's Grocery Co., 384 U.S. 270, 277, 86 S.Ct. 1478, 1482, 16 L.Ed.2d 555 (1966).

The beneficial effects upon competition exerted by a potential competitor outside the market may be of two kinds. These will be denoted the "entry effect" and the "edge effect." The entry effect arises from the likelihood of actual market entry by the potential competitor at some time in the future. The potential competitor itself "may someday go in and set the stage for noticeable deconcentration," United States v. Ford Motor Co., 286 F.Supp. 407 (E.D.Mich.1968), *aff'd.* 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). As Chief Justice Burger stated in his opinion concurring and dissenting (but only as to the relief ordered) in *Ford,* 405 U.S. at 587, 92 S.Ct. at 1156, the "ground typically present" in a potential competition case is that the acquisition "has deprived the market of the pro-competitive effect of an increase in the number of competitors."

The crux of the entry effect is that if the company which enters the market by acquisition had entered unilaterally,[4] it would have supplied an additional competitive force without eliminating one already present in the market. An acquisition of a company in the market by a company which is likely to enter on its own thus has an anticompetitive effect on the market.

The edge effect, sometimes termed the "waiting-in-the-wings" or the "on-the-fringe" effect, is the beneficial effect

4. Throughout this opinion, the terms "unilateral entry," "independent entry," or *"de novo* entry" will denote entry into a market through the entering firm's own efforts without a purchase or acquisition of stock or assets of a firm already in the market other than of a *de minimis* nature.

upon competition exerted when a company is poised on the edge of the market, threatening to enter if market conditions become sufficiently favorable. The importance of the edge effect derives from the realization that the competitive behavior of companies is not determined solely by the actions and intentions of those in the market, but also by the actions and perceived intentions of those outside the market who may come in. The presence of a potential entrant on the edge of the market exerts a moderating influence on those inside. If the firms inside raise prices beyond a certain level, for instance, a company on the edge may decide to enter because the profitability of entering would be enhanced by the higher prices. Its entry, in turn, would make conditions in the market more competitive.

The importance of the edge effect was recognized in United States v. Penn-Olin Chemical Co., *supra,* in which the Supreme Court stated:

> "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated." 378 U.S. at 174, 84 S.Ct. at 1719.

The Court in *Penn-Olin* pointed out that "[p]otential competition . . . as a substitute for [actual competition] may restrain producers from overcharging those to whom they sell or underpaying those from whom they buy," and that "[p]otential competition . . . may compensate in part for the imperfection characteristic of actual competition in the great majority of competitive markets." *Id.* The Court was concerned that the potential entrant "might have remained at the edge of the mar-

ket, continually threatening to enter," or that it might have "remained aloof watching developments." *Id.,* at 173, 174, 84 S.Ct. at 1718.

In FTC v. Procter & Gamble Co., 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L. Ed.2d 303 (1967), the Court concluded that "[i]t is clear that the existence of Procter at the edge of the industry exerted considerable influence on the market," due in part to the fact that "the market behavior of the liquid bleach industry was influenced by each firm's predictions of the market behavior of its competitors, actual and potential."

In United States v. Falstaff Brewing Corp., 410 U.S. 526, 531–532, 93 S.Ct. 1096, 1100, 35 L.Ed.2d 475 (1973), the majority [5] opinion stressed the importance of the edge effect in evaluating the consequences of an acquisition under § 7:

> "Suspect also [under § 7] is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. FTC v. Procter & Gamble Co., 386 U.S. at 580–581, 87 S.Ct. 1224; United States v. Penn-Olin Chemical Co., 378 U.S. at 174, 84 S.Ct. 1710. . . ."

In Falstaff, the district court dismissed the government's complaint because it found that the acquisition did not eliminate a substantial procompetitive entry effect—that is, that the acquiring company would not have entered the market itself, and that therefore no

---

5. Seven Justices participated in the decision in *Falstaff.* Justice White delivered the opinion of the Court, in which Chief Justice Burger and Justice Blackmun joined, and in Part I of which Justice Douglas joined. Thus, references to Part I of the Court's opinion may properly be considered references to the "majority" opinion. Justice Douglas filed an opinion concurring in part, and Justice Marshall's opinion concurred in the result. Justice Rehnquist filed a dissenting opinion in which Justice Stewart joined.

substantial procompetitive effect arising from possible future entry was eliminated by Falstaff's acquisition of Narragansett. The Supreme Court reversed and remanded the case primarily because the district court had neglected to consider the edge effect upon competition exerted by Falstaff as a potential competitor:

"The District Court erred as a matter of law. The error lay in the assumption that because Falstaff as a matter of fact, would never have entered the market *de novo*, it could in no sense be considered a potential competitor. More specifically, the District Court failed to give separate consideration to whether Falstaff was a potential competitor in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market.

"A similar error was committed by the Court of Appeals in FTC v. Procter & Gamble Co., *supra,* where one of the reasons for the Commission finding the acquisition in violation of § 7 was that the merger eliminated Procter as a potential entrant, not because Procter would have entered independently, but because the acquisition eliminated the procompetitive effect Procter exerted from the fringe of the market. *Id.,* at 575, 87 S.Ct. 1224. The Court of Appeals struck down this finding because there was no evidence that Procter ever intended *de novo* entry, but we held the Commission's finding was 'amply supported by the evidence,' *id.,* at 581, 87 S. Ct. 1224, because the evidence 'clearly show[ed] that Procter was the most likely entrant,' *id.,* at 580, 87 S.Ct. 1224, and it was 'clear that the existence of Procter at the edge of the industry exerted considerable influence on the market,' *id.,* at 581, 87 S.Ct. 1224. Thus the fact that Falstaff and its management had no intent to enter *de novo,* and would not have done so, does not *ipso facto* dispose of the potential competition issue.

". . . The District Court should therefore have appraised . . . whether in any realistic sense Falstaff could be said to be a potential competitor on the fringe of the market with likely influence on existing competition. . . ." 410 U.S. at 532–534, 93 S.Ct. at 1100. (Footnote omitted.)

The Court in *Falstaff* held that the elimination through acquisition of a significant, objectively evidenced, on-the-fringe potential competitor is sufficient by itself to violate § 7—even if it were assumed that the potential competitor would not actually have entered the market. Thus, the decision went beyond *Penn-Olin* and *Procter & Gamble* in recognizing the competitive significance of a company which might merely exercise a procompetitive effect on the edge of the market, regardless of whether it is likely to enter the market unilaterally at some future date.

Therefore, if the acquisition of the Tidewater assets by Phillips either foreclosed a likely future actual entry by Phillips which would have had a substantial effect upon competition, or eliminated a substantial effect upon competition arising from Phillips' position at the edge of the market, the acquisition violated § 7.

The court finds that both a substantial entry effect and a substantial edge effect were eliminated by the acquisition. Either one of these anticompetitive effects alone would have been sufficient to make the acquisition illegal under § 7; their combination renders the anticompetitive consequences of the acquisition even greater.

*The Standards Used in Assessing the Effects on Competition of an Acquisition Under § 7—Objective vs. Subjective Evidence*

The Supreme Court in evaluating the effect on competition of an acquisition has moved toward an increased reliance on objective rather than subjective evidence of management's intent. In 1962 in *Brown Shoe, supra,* 370 U.S. at 342 n. 69, 82 S.Ct. at 1533, the Court recog-

nized "that in cases of this type precision in detail is less important than the accuracy of the broad picture presented." The Court held that a merger of two healthy, profitable horizontal competitors which jointly held 5% of the market violated § 7. The following year, in *Philadelphia National Bank, supra,* the Court stated:

"Clearly, this is not the kind of question which is susceptive of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency' . . . yet the relevant economic data are both complex and elusive. . . . So also, we must be alert to the danger of subverting congressional intent by permitting a too-broad economic investigation." 374 U.S. at 362, 83 S. Ct. at 1741.

Because of concern with high levels of concentration in *Philadelphia National Bank,* the Supreme Court concluded that objective economic facts must be emphasized:

"This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. . . . Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." 374 U. S. at 363, 83 S.Ct. at 1741.

In *Penn-Olin, supra,* decided in 1964, the Court stated, "We reiterate that it is impossible to demonstrate the *precise*

competitive effects of the elimination of either Pennsalt or Olin as a potential competitor." 378 U.S. at 176, 84 S.Ct. at 1720. In 1966, in *Von's Grocery, supra,* the Court found that while concentration levels in the market were still relatively low, there was a trend toward concentration, and the two merging firms, which were the third and sixth largest in the market, together accounted for 7.5% of the market. It held that "these facts alone are enough to cause us to conclude contrary to the District Court that the Von's-Shopping Bag merger did violate § 7." 384 U.S. at 274, 86 S.Ct. at 1480.

Subjective evidence of the intentions of corporate management has never been accepted by the Supreme Court as a basis for concluding that a firm is not a potential entrant into a market. In *Penn-Olin, supra,* the Court, following a full review of objective evidence showing the capability and incentive of the joint venturers to enter the market independently, specifically rejected reliance upon subjective evidence:

"Unless we are going to require subjective evidence, this array of probability certainly reaches the prima facie stage. As we have indicated, to require more would be to read the statutory requirement of reasonable probability into a requirement of certainty. This we will not do." 378 U. S. at 175, 84 S.Ct. at 1719.

The Court stated flatly that "[p]otential competition cannot be put to a subjective test," *id.,* at 174, 84 S.Ct. at 1718, and outlined a group of objective factors which it directed the district court to consider on remand, including "the number and power of the competitors in the relevant market," "the background of their growth," and "the power of the joint venturers." *Id.* at 176–177, 84 S.Ct. at 1720.

In *Procter & Gamble, supra,* the Court concluded that the acquisition of Clorox by Procter & Gamble eliminated a potential competitor, entrenched a market leader, and raised barriers to entry. The Court of Appeals had refused to ac-

cept a finding by the Federal Trade Commission that the conglomerate merger removed a potential competitor ". . . because there was no evidence that Procter's management had ever intended to enter the industry independently and that Procter had never attempted to enter." 386 U.S. at 580, 87 S.Ct. at 1231. The Supreme Court reversed the Court of Appeals and upheld the Commission's finding on the basis of objective evidence:

> "The evidence . . . clearly shows that Procter was the most likely entrant. Procter had recently launched a new abrasive cleaner in an industry similar to the liquid bleach industry, and had wrested leadership from a brand that had enjoyed even a larger market share than had Clorox. Procter was engaged in a vigorous program of diversifying into product lines closely related to its basic products. Liquid bleach was a natural avenue of diversification since it is complementary to Procter's products, is sold to the same customers through the same channels, and is advertised and merchandised in the same manner. Procter had substantial advantages in advertising and sales promotions. . . . Procter's management was experienced in producing and marketing goods similar to liquid bleach. Procter had considered the possibility of independently entering but decided against it because the acquisition of Clorox would enable Procter to capture a more commanding share of the market." 386 U.S. at 580–581, 87 S.Ct. at 1231.

In United States v. Falstaff Brewing Corp., *supra*, the Court reaffirmed the determinative nature of objective economic facts in evaluating the effects upon competition. The district court held that Falstaff "had no intent to enter the New England market except through acquisition and . . . therefore could not be considered a potential competitor, . . . relying heavily on testimony of Falstaff officers," 410 U.S.

at 532, 93 S.Ct. at 1100. The Supreme Court reversed and remanded the case because the district court had only considered the effect arising from the possibility of a future entry by Falstaff but not the effect exerted by Falstaff at the fringe of the market. In doing so, the Court indicated that objective rather than subjective evidence should receive primary weight in evaluating an acquisition's effect upon competition; and specifically stated subjective evidence, while relevant, could not be considered as determinative of a conclusion that an acquisition does not violate § 7:

> "The specific question . . . is not what Falstaff's internal company decisions were but whether, given its financial capabilities and conditions in the New England market, it would be reasonable to consider it a potential entrant into that market. Surely, it could not be said on this record that Falstaff's general interest in the New England market was unknown; and if it would appear to rational beer merchants in New England that Falstaff might well build a new brewery to supply the northeastern market then its entry by merger becomes suspect under § 7. The District Court should therefore have appraised the economic facts about Falstaff and the New England market in order to determine whether in any realistic sense Falstaff could be said to be a potential competitor on the fringe of the market with likely influence on existing competition. This does not mean that the testimony of company officials about actual intentions of the company is irrelevant or is to be looked upon with suspicion; but it does mean that theirs is not necessarily the last word in arriving at a conclusion about how Falstaff should be considered in terms of its status as a potential entrant into the market in issue." 410 U.S. at 533–536, 93 S.Ct. at 1101. (Footnotes omitted.)

In a lengthy footnote, the *Falstaff* majority emphasized that the Court's de-

cision in *Procter & Gamble, supra*, was grounded on objective factors:

"In FTC v. Procter & Gamble Co., 386 U.S. 568, 581, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), we found the acquiring company at the edge of the market exerted 'considerable influence' on the market because 'market behavior . . . was influenced by each firm's predictions of the market behavior of its competitors, actual and potential'; because 'barriers to entry . . . were not significant' as to the acquiring company; because 'the number of potential entrants was not so large that the elimination of one would be insignificant'; and because the acquiring firm was the most likely entrant." 410 U.S. at 534 n. 13, 93 S.Ct. at 1101.

In the same footnote, the majority specifically stated that the same objective evidence which might establish a company as a likely market entrant in the future (*i. e.*, the entry effect) would also constitute circumstantial evidence of the firm's on-the-fringe (edge) effect on the market.[6] The majority opinion stated:

"The Government did not produce direct evidence of how members of the New England market reacted to potential competition from Falstaff, but circumstantial evidence is the lifeblood of antitrust law [citations], especially for § 7 which is concerned 'with probabilities, not certainties.' Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As was stated in United States v. Penn-Olin Chemical Co., 378 U.S. 158, 174, 84 S.Ct. 1710, 12 L.Ed. 2d 775 (1964), 'potential competition cannot be put to a subjective test. It is not "susceptible of a ready and precise answer." '

"Nor was there any lack of circumstantial evidence of Falstaff's on-the-fringe competitive impact. As the record shows, Falstaff was in the relevant line of commerce, was admittedly interested in entering the Northeast, and had among other ways . . . made its interest known by prior acquisition discussions. Moreover, there were, as my Brother Marshall would put it, objective economic facts as to Falstaff's capability to enter the New England market; and the same facts which he would have the District Court judge look to in determining whether the particular theory of potential competition we do not reach has been violated, would be probative of violation of § 7 through loss of a procompetitive on-the-fringe influence. See FTC v. Procter & Gamble Co., 386 U.S. at 580–581, 87 S.Ct. 1224, 18 L. Ed.2d 303; United States v. Penn-Olin Chemical Co., 378 U.S. at 173–177, 84 S.Ct. 1710, 12 L.Ed.2d 775; United States v. El Paso Natural Gas Co., 376 U.S. 651, 660, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964)." 410 U.S. at 534–535, n. 13, 93 S.Ct. at 1101.

The objective evidence that Falstaff was engaged in the beer industry, was interested in the New England market and had investigated market entry via acquisition, and had the economic capability to enter, was held by the Court to be probative, in the face of conflicting subjective evidence, or Falstaff's on-the-fringe competitive impact when there were relatively few such potential entrants. The Court left open the question of whether § 7 bars a merger by a company whose entry into the market would leave competition in the marketplace exactly as it was before the merger—where there was both no preexisting procompetitive edge effect and where the entrant will not be "a dominant force" in the market. 410 U.S. at 537, 93 S.Ct. 1096.[7]

---

**6.** Justice Marshall agreed with this view, in addition to Chief Justice Burger and Justices White, Blackmun, and Douglas.

**7.** The Court also implied that it was not adopting the district court's technically undisturbed finding, made on the basis of subjective evidence of management intent, that Falstaff was not a potential unilateral entrant. The language in note 13 implies that the likelihood of future market entry is to be determined primarily on the basis of

There are several reasons for preferring objective evidence to subjective evidence. To begin with, entry by acquisition is almost always more attractive to management than independent entry. An acquisition enables a company to quickly capture the acquired company's share of the market. Risk is minimized. Moreover, the competitive force of the acquired company, which would be present if the acquiring company entered unilaterally, is eliminated. It will thus be in a company's self-interest to present subjective evidence of a lack of any intent to enter the market unilaterally and of a lack of any effect on the competitive behavior of firms in the market arising from the company's presence on the edge of the market. As one commentator has noted:

"The determination of what a large corporation acting through staff agencies, committees, officers and directors intends to do—not merely in the present, but at some future time as well, delves into vagaries of corporate decision-making and into a vast labyrinth of evidence. More importantly, once the legal issues are known to astute corporate counsel, future facts as to corporate intent can be expected to be shaped under careful legal guidance to negate any inference that a corporation intended to enter any particular market which it later enters by merger." Brodley, Oligopoly Power Under the Sherman and Clayton Acts —From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285, 357–58 (1967).

A second reason for preferring objective evidence to subjective evidence in antitrust cases is to provide certainty and predictability to business planning. Reliance upon subjective evidence of corporate intentions or preferences would make the antitrust consequences of an acquisition unpredictable to businessmen and government attorneys alike. As the Supreme Court noted in *Philadelphia National Bank, supra,* 374 U.S. at 362,

83 S.Ct. at 1741, "unless businessmen can assess the legal consequences of a merger with some confidence, sound business planning is retarded." And in discussing the application of a *per se* rule involving § 1 of the Sherman Act, 15 U.S.C. § 1, the Court in United States v. Topco Associates, 405 U.S. 596, 609 n. 10, 92 S.Ct. 1126, 1134, 31 L.Ed. 2d 515 (1972), observed:

"Without the *per se* rules, businessmen would be left with little to aid them in predicting in any particular case what courts will find to be legal and illegal under the Sherman Act. Should Congress ultimately determine that predictability is unimportant in this area of the law, it can, of course, make *per se* rules inapplicable in some or all cases, and leave the courts free to ramble through the wilds of economic theory in order to maintain a flexible approach."

While reliance on objective factors would not by any means provide complete certainty regarding the antitrust consequences of business decisions, it would provide greater predictability than reliance upon a judicial determination of management's intent.

There is another reason why identifying potential competitors on the basis of objectively evidenced capability, economic incentives and desires is preferable to reliance upon subjective evidence. The firms which are in the market and are likely to be influenced by the existence of a potential competitor on the edge of the market usually will not be aware of its subjective intentions and evaluations with any degree of precision. Firms in the market will react to firms on the edge which they see as likely to enter by virtue of obvious facts relating to the company's capability, incentives and evidenced interests. Such objective factors constitute the primary component of the edge effect.

■ The defendants in the instant case have stressed subjective evidence—

objective evidence, at least where this aspect of potential competition is accompanied by

likely on-the-fringe influence on existing competition.

primarily testimony by corporate officers—that Phillips never attempted a unilateral entry into the California motor gasoline market and that its management never intended or adopted a plan to do so. For the reasons discussed above, such subjective evidence, while relevant and entitled to consideration, cannot be determinative in evaluating the legality of the acquisition under § 7. If strong objective evidence points to a contrary conclusion, the objective evidence must prevail.

The court has relied primarily upon objective evidence to determine whether either a procompetitive entry effect or a procompetitive edge effect was eliminated as a result of Phillips' acquisition of Tidewater's assets. Among the factors the court has considered are: (1) the fact that Phillips was in the relevant line of commerce, and the history of Phillips' activities therein; (2) previously expressed indications of Phillips' interest in entering the California market; (3) objective economic facts indicating Phillips' capability to enter the California market unilaterally; (4) objective economic facts indicating Phillips' incentives to enter the California market; (5) recognition by others in the industry of Phillips as a potential entrant into the California market; and (6) objective economic facts relating to the structure and degree of concentration of the market and barriers to entry therein.

■■ The court adopts the standard that where credible objective evidence shows the basic economic facts of the acquiring company's overall size, resources, capability, and motivation with respect to entry into an adjacent attractive market involving a line of commerce in which the firm is already heavily engaged, that firm must be considered to be a significant potential entrant unless it is objectively demonstrated that some unique feature of the market precludes such entry. Moreover, where the market is concentrated and there are few such likely entrants, whether due to the existence of high barriers to entry or

for other reasons, no further inquiry is required as to the anticompetitive effect of the acquisition, and that effect must be considered to be substantial within the meaning of § 7.

On the basis of the objective evidence set forth below, the court finds that (1) Phillips was a likely potential unilateral entrant into the California motor gasoline market, and in fact was the most likely potential entrant; and (2) Phillips exerted, prior to the Tidewater acquisition, a substantial procompetitive effect on the behavior of those in the market from its position on the edge of the market. Both Phillips' status as the most likely potential entrant and the procompetitive effect exerted by Phillips on the fringe were eliminated when Phillips acquired the Tidewater assets. The anticompetitive effects of the elimination of Phillips as a possible future entrant and of the procompetitive edge effect it exerted were both substantial. Either of these anticompetitive effects alone, as well as both in conjunction, cause the acquisition to be illegal under § 7 of the Clayton Act.

### Phillips' Capability of Entry

Objective factors make it clear that Phillips possessed the capability to make a unilateral entry into the California motor gasoline market in 1965–66 had it chosen to do so.

Phillips at the time of the Tidewater acquisition was one of the leading domestic oil companies, ranking eighth in assets, ninth in net income, tenth in gross sales, and eleventh in refining capacity.

During the first 10 years of its existence, Phillips steadily expanded its production of crude oil and natural gas liquids and inaugurated its program of assembling large reserves of raw materials. Beginning in 1927 with the opening of several service stations in Oklahoma and Kansas, Phillips entered into the marketing and then the refining and transportation phases of the oil industry. Phillips' management envisioned the need for refineries and retail outlets

as a vehicle for establishing a continuing market for raw materials.

Phillips experienced a dramatic expansion in both marketing and refining capacity. By 1965, it had about 19,500 branded service stations located in 48 states and the District of Columbia, including one at Needles, California. This California outlet was closed during the latter part of 1965. At the time of the Tidewater acquisition, Phillips had approximately 19,700 branded service stations located in all states except California, Alaska and Hawaii. It also had approximately 4,000 marketing outlets other than branded service stations. It ranked among the top 10 companies in motor gasoline sales in 30 states and marketed in every region of the continental United States except California.

At no time prior to the Tidewater acquisition did Phillips ever enter a new marketing area by acquiring a major company in that market. Its prior marketing expansion was accomplished through unilateral entry, except for its entry into the northern Rocky Mountain region. That move was accomplished by acquiring several small companies that were not among the leaders in their respective markets.

Phillips' unilateral expansion in all areas of its operation, including marketing, was particularly rapid following World War II. During the first decade after the war, Phillips grew at a faster rate than any of the 20 largest oil companies, spurred by a dynamic sales force. Between 1947 and 1966, Phillips began marketing branded gasoline and other refined products in 27 new states, including the Southeast, the East Coast and most of the West. The Tidewater acquisition in 1966 and Phillips' subsequent entry into Alaska has put Phillips in the select category of companies marketing through branded service stations in all 50 states. In addition, Phillips has become one of the leading marketers in Canada through its 45% interest in Pacific Petroleums Ltd., one of the five largest Canadian oil companies.

Phillips' refining and marketing expansion has been supported by the building of a huge pipeline complex to transport crude oil and refined products. The company's pipeline system consists of more than 3,000 miles of wholly owned common carrier products lines, more than 3,000 miles of common carrier crude oil lines, and thousands of additional miles of jointly owned lines. Phillips constructed the first long-distance multi-product pipeline in the United States from its Borger, Texas refinery to East St. Louis, Illinois.

Phillips' record of dynamic internal growth has made it a leading international company with substantial interests in many parts of the world. It has petroleum exploration interests in 22 nations, oil and gas reserves in 14, petroleum refining interests in seven, petrochemical manufacturing or fabrication interests in 20, and product sales in more than 70. In addition to its extensive domestic interests in crude oil reserves and production (including Alaska's North Slope and Cook Inlet and areas offshore California), Phillips produces petroleum in such areas as Egypt, Venezuela, Libya and Kuwait. It has a prominent position in developing production areas in the North Sea, offshore New Guinea, offshore Iran and Nigeria. At the time of the Tidewater acquisition, Phillips' foreign crude oil production almost equaled its domestic production.

One indication of Phillips' strength in research and development and technology is the fact that for many years, it has ranked first or second among domestic oil companies in the number of United States patents issued.

Phillips' dramatic record of growth is in large part attributable to its management's conscious search for balance and diversification in order to protect the company's long-range interests. In a speech to a group of San Francisco security analysts on February 10, 1966, while he was negotiating the Tidewater acquisition, Phillips' executive vice pres-

ident, John M. Houchin, explained the company's policy as follows:

"Phillips is among the most highly diversified of all oil companies. Our objective is balanced diversification, both as to variety of activities and as to geography, because we are confident the resulting financial stability benefits stockholders and employees over the long pull. We are constantly working to achieve optimum balance."

Phillips was active in California even before it entered the California motor gasoline market by means of the Tidewater acquisition. As Houchin told the security analysts:

"Phillips is more active in this state than many realize. We have production and exploration interests here, although the exploration is largely confined to offshore areas and the Sacramento basin. And, both directly and through subsidiaries, we are engaged in the manufacture and marketing of many plastic items and packaging, and the marketing of fertilizers, our full lines of rubber carbon black, high-purity hydrocarbons, and many specialty chemicals."

Houchin also pointed out that Phillips was the second largest industrial firm headquartered west of the Mississippi River—surpassed only by Standard Oil Company of California.

A further indication that Phillips had the financial strength to enter the California motor gasoline market unilaterally is the relative ease with which the company was able to finance the $366 million Tidewater acquisition and absorb substantial post-acquisition losses totaling well over $100 million. First Boston Corporation, the underwriter of the issue by Phillips of $200 million in long-term notes in connection with the Tidewater acquisition, was not concerned with Phillips' ability to finance the acquisition or with the rate of return which Phillips anticipated from the investment. The advisability of the acquisition was "simply not a factor" in First Boston's decision to act as Phillips'

agent for the direct placement of the $200 million in notes. First Boston did not consider the Tidewater acquisition to be a particularly large one for a company of Phillips' size, and determined that superimposing the acquired Tidewater assets upon Phillips' balance sheet and earnings statement "did not have a great effect."

Unlike Phillips' prior history of largely incremental marketing expansion from existing refineries and supply points, a unilateral entry into California on a substantial scale would have involved the eventual acquisition or construction of a refinery on the West Coast. The need for a permanent, substantial entrant into the California market to have a West Coast refinery is due primarily to the fact that the West Coast, unlike the East Coast, has a substantial amount of local crude production. A major marketer on the West Coast with no local refining facilities would have to transport product a considerable distance, purchase it on the West Coast, or exchange product elsewhere for product on the West Coast. Although these methods of obtaining West Coast product supplies are quite feasible while an entrant is building its marketing volume to the point where a West Coast refinery can be operated at an economical level of capacity, and as a supplemental source of supply thereafter, unlimited reliance upon them on a permanent basis would place the marketer at a disadvantage with respect to those West Coast majors having local refining facilities. On the East Coast, by contrast, the absence of local crude production largely rules out any cost advantage of an East Coast refinery over a Gulf Coast refinery due to transportation savings. The cost of product on the East Coast will be about the same whether crude is transported from the Gulf Coast to an East Coast refinery or product is transported from a Gulf Coast refinery to the East Coast. The high degree of competence and initiative shown by Phillips' management when Phillips expanded into other areas, com-

bined with Humble Oil's prior unilateral entry into the California market through construction of its own refinery, point to the conclusion that Phillips would have been able to successfully build its own West Coast refinery.

The court has analyzed Phillips' capability to make a unilateral entry into the California motor gasoline market on the basis of such objective criteria as the company's financial strength as indicated by its assets, its income, it debt ratio and its production and capacity levels; and its experience in organization, marketing, and managerial performance. On the basis of these objective factors, the court has determined that such a unilateral entry was clearly possible.

*Phillips' Motivation for and Expressed Interest in Entering the California Market*

■ Motivation, like capability, must be assessed primarily on the basis of objective evidence. The relevant objective factors are corporate actions which demonstrate a strong desire for market entry, and economic facts or conditions which indicate that it would be in the company's interest to participate in the market. Objective evidence of desire is particularly important. A company with capability and an intense desire for market entry would have to be regarded as a potential unilateral entrant even if it were impossible to explain this desire in conventional economic terms. If a company clearly has a strong desire to enter a given market, for whatever reason or even in the absence of a discernible reason, it is sufficient by itself to establish motivation.

There is abundant objective evidence that Phillips had an intense desire to enter the California motor gasoline market. Starting with a well-defined company goal of nationwide marketing, Phillips explored every possible means of entering California—a large acquisition, a joint venture, a foothold acquisition, and unilateral entry. Not surprisingly, its preferred method of entry was

through a large acquisition. By stepping into the shoes of an established major factor in the market, a new entrant attains immediate market-wide recognition, even though it must still gain public acceptance of its distinctive brand, avoids much of the effort and inconvenience which would be involved in the selective duplication of the acquired facilities attendant upon a unilateral entry, avoids a great deal of risk, and enjoys the prospect of modest growth within the limits of the acquired company's market share without serious challenge from rivals. This method of entry is, however, inconsistent with the objectives of the antitrust laws precisely because of these features. An entrant by large acquisition who could have entered unilaterally has been lost as an aggressive new competitive force in the market.

Phillips had a clearly evidenced desire to become a nationwide marketer prior to its acquisition of Tidewater. The advantages of marketing nationwide were detailed by the Supreme Court in *United States v. Falstaff Brewing Corp., supra.* The Court's observations about the beer industry apply equally well to the sale of motor gasoline:

National brewers possess competitive advantages since they are able to advertise on a nationwide basis, their beers have greater prestige than regional or local beers, and they are less affected by the weather or labor problems in a particular region. Thus Falstaff concluded that it must convert from 'regional' to 'national' status, if it was to compete effectively with the top four producers . . . ." 410 U.S. at 529, 93 S.Ct. at 1099. (Footnote omitted.)

Phillips' goal of becoming a nationwide marketer was confirmed by the testimony of a former official of its supply and transportation department, John L. Kyser. Kyser was involved in supply and transportation matters relating to Phillips' marketing expansion into the southeastern United States in the 1950's. He testified that during this southeastern

expansion, it was common knowledge around the company that Phillips wanted to become a national marketer, and characterized nationwide marketing as "a target or goal" of Phillips' management. He specifically recalled that this goal included market entry into the West Coast as well as the East Coast— the only two regions which Phillips had not then penetrated.

Several possibilities for unilateral entry were investigated by Phillips personnel, including: (1) obtaining a steadily increasing supply of gasoline on the West Coast by exchange with a West Coast major for Gulf Coast or Mid-Continent gasoline; (2) building a products pipeline from Phillips' Borger, Texas refinery to the West Coast; (3) extending an existing jointly owned products pipeline from Albuquerque, New Mexico to the West Coast; (4) transporting gasoline by barge down the Columbia River from a pipeline terminal at Pasco, Washington, which could be served from Phillips' refinery at Woods Cross, Utah; and (5) shipping gasoline by tanker from Phillips' Gulf Coast refinery to a West Coast terminal. Phillips personnel also discussed building a West Coast refinery in connection with entry into the market.

Advance planning was done on the West Coast by representatives of the Phillips marketing department, just as had been done prior to Phillips' entry into the Southeast. Phillips contacted virtually every refiner on the West Coast about obtaining gasoline supplies there in sufficient volumes to support a marketing entry. Kyser testified:

"[L]ater on in time when there was more of a desire to expand on the West Coast and into California, we canvassed, talked to, visited with nearly all, if not all, of the refineries in the area in an attempt to obtain exchange gasoline that would permit marketing over the entire area."

Kyser also testified as to advance work performed by the Phillips sales department:

"Sales representatives spent considerable time out here reviewing the marketing activities of the other companies, reviewing the prospects for obtaining jobbers or unbranded sales outlets where Phillips could sell motor fuel, refined products, without having to build their own service stations."

Kyser testified that neither he nor other Phillips personnel were encouraged at the time by their investigations, and that no formal reports were submitted to the Phillips Operating Committee or to the company's top management with respect to either individual investigations or the overall feasibility of unilateral entry. Phillips never made the kind of rigorous, full-scale analysis of unilateral entry which Humble Oil & Refining Company later made, and which led Humble to launch a unilateral entry after being denied the Tidewater acquisition. It is clear from the evidence as a whole that Phillips' management was not interested in giving serious consideration to unilateral entry as long as there remained the possibility of entering the California market by means of a large acquisition. The investigations of possibilities for unilateral entry do, however, show Phillips' interest in entering the California market and awareness of the various possibilities for entry on the part of the company's operating personnel. Cf. Procter & Gamble, supra, 386 U.S. at 580–581, 87 S.Ct. 1224.

The desire of Phillips' management to enter the California market through a large acquisition or joint venture is indicated by its somewhat complicated dealings with Union Oil Company of California beginning in 1959. W. W. Keeler, then Phillips' executive vice president, broached the subject of a Phillips-Union merger with Union's president, A. C. Rubel, in February 1959. Rubel advised him that Union had no interest in a merger with Phillips.

Keeler subsequently discussed with K. S. Adams, Phillips' president, the possibility of seeking some type of cooperation from Union, and Adams decided that

Phillips should acquire a substantial amount of Union stock. The Phillips Board of Directors approved a $50 million stock purchase in April 1959, and Phillips then acquired more than 10% of Union's outstanding stock. Keeler testified that, in his view, Adams decided upon the stock purchase in order to place Phillips in a better position to discuss merger possibilities or other forms of cooperation with Union's management. Following a government antitrust suit against Phillips and Union challenging the stock acquisition, Phillips sold the stock.

Phillips executives also considered the possibility of suggesting to Union that the two companies establish a joint venture which would own and operate Union's West Coast manufacturing, terminal and transportation facilities. In addition, Phillips' vice president in charge of marketing at the time, E. H. Lyon, discussed the possibility of acquiring certain Union service stations with Fred Hartley, then Union's vice president of marketing. Phillips executives also considered a plan developed in the refining department to construct a refinery in the Puget Sound area.

The alternative of making a small foothold refining-marketing acquisition on the West Coast was also investigated. In June 1963, Phillips sent representatives of its refining and marketing departments to the West Coast to inspect and evaluate the assets of Fletcher Oil Company, which had a refinery at Wilmington, California, and 105 service stations in California, Oregon and Washington. Phillips was interested in the Fletcher properties as a possible means of entry into the California market. Phillips' management later rejected the idea of acquiring Fletcher, primarily because the refinery site was so small that it did not allow space for future refinery expansion.

In 1964 and 1965, Phillips' top management engaged in several discussions with the president of Richfield Oil Corporation, Charles Jones, concerning the possibility of Phillips acquiring Rich-

field's stock. Phillips was initially unwilling to pay the price demanded by Richfield on the basis of the limited information it had, and was still seeking more information about Richfield's operations when Richfield was acquired by Atlantic Refining Company. The analyses of the Richfield assets made by Phillips personnel emphasized its West Coast refining and marketing operations. One such analysis stated that the primary advantage to Phillips of acquiring Richfield would be "[a] large product outlet (158 thousand B/D) in a fast growing market area not now served by Phillips." The acquisition of Richfield would have accomplished much the same result that the Tidewater acquisition one year later accomplished—it would have enabled Phillips to step into the shoes of one of the established West Coast major oil companies.

The acquisition of the Tidewater assets for $366 million was accomplished after a relatively casual examination of the Tidewater assets. Only sketchy information was provided by Tidewater, and there was good reason to believe that substantial additional expenditures would have to be made to renovate and upgrade deteriorated facilities. One Phillips official, Senior Vice President Charles Kittrell, testified that Phillips' management at the time regarded the Tidewater acquisition as the last chance for Phillips to enter the West Coast market by means of a large acquisition.

The only inspection of the Tidewater assets made by Phillips was a trip made by Houchin and various other personnel early in the negotiations. Houchin testified that they were virtually "flying blind" because they could get no factual information from Tidewater's files except for bits and pieces at night, due to Tidewater's fear that employee morale might be adversely affected. Houchin's team had to appraise the Tidewater service stations from the street and make estimates of the volume of traffic going in and out, since they could not obtain asset figures and actual station sales figures. C. C. Tate of Phillips' re-

fining department testified that he inspected the Avon, California, refinery by driving around the refinery in a car for several hours without going inside the refinery facilities. The casualness of the examination of the Tidewater assets by Phillips personnel, and Phillips' willingness to accede to Tidewater's demand that the examination be kept absolutely secret so as not to impair employee morale, can only be explained by an overwhelming desire for market entry on Phillips' part.

Phillips was also well aware of the attractiveness of the California market for motor gasoline. Not only was Phillips' management fully cognizant of the enormous potential of the California market in terms of size and rate of growth at the time of the Tidewater acquisition, but its management considered it to be an unusually profitable market. Top Phillips executives testified that at the time of the acquisition they regarded the West Coast generally as being more profitable than the mid-Continent area where Phillips had its strongest representation, and also felt that gasoline prices had been more stable on the West Coast. Statistical evidence shows that, as of 1965, a significantly higher percentage of crude oil was converted into gasoline at West Coast refineries than on the East Coast; a higher percentage of West Coast sales were of premium gasoline; octane ratings for both premium and regular gasolines were lower on the West Coast than in the Middle Atlantic states; and the cost of domestic crude oil was less at a Los Angeles refinery than at a Philadelphia refinery.

Another objective factor which encouraged Phillips to seek to enter the California market is the advantages derived from nationwide marketing. In the oil industry, these advantages include benefits associated with nationwide advertising and brand loyalty, nationwide use of credit cards, and added flexibility in exchanging crude oil and refined products to correct regional imbalances.

Between 1965 and 1970, Phillips spent between $10 and $15 million annually on advertising. There are two distinct advantages related to advertising and brand loyalty which stem from nationwide marketing. First, a nationwide marketer has its brand known in all regions of the country. Residents of each region can purchase its products not only when driving in their own region but also when driving in other areas of the country—a significant consideration in travel-minded America.[8] The company marketing in only one region, by contrast, can make sales only in that region, and is unlikely to make significant sales there to motorists from other areas. Second, nationwide marketing confers benefits in the cost of advertising media, since the nationwide marketer can use national advertising media more efficiently (at a lower cost per 1,000 households).

Phillips was well aware at the time of the Tidewater acquisition of the advantages of nationwide marketing. They were described in the brochure prepared by First Boston Corporation in connection with the financing for the acquisition, and were detailed in a letter from Phillips' president to its shareholders describing the anticipated benefits of the acquisition. Phillips did not begin using national network television until after the acquisition. While it might have taken longer for Phillips to have realized the advantages of nationwide marketing if it had entered unilaterally instead of by acquiring Tidewater's as-

8. Another factor motivating Phillips to enter the California market was the trend in the 1950's and 1960's among other leading oil firms to expand their marketing activities geographically. For example, Atlantic Refining Company's marketing area expanded from 17 states in 1956 to 46 in 1970, while Gulf's expanded from 39 in 1961 to 48 in 1970. Phillips' marketing activities grew from 35 states in 1956 to 50 states when it established a service station at Anchorage, Alaska, following its acquisition of Tidewater. The primary purpose of Phillips' expansion into Alaska was to be able to advertise that it marketed in all 50 states.

sets, those benefits would have eventually accrued regardless of the method of entry into the California market.

The effect of nationwide marketing on credit card use is reflected in a notice sent to active Phillips credit card holders shortly after the Tidewater acquisition:

"You now can enjoy Phillips fine products and service in 49 states [Phillips had not yet entered Alaska] through your Phillips 66 credit card!
. . .

"The addition of the marketing outlets in the Far West now makes Phillips a truly nationwide, coast-to-coast oil company equipped to serve motoring customers with quality products and outstanding service in service stations extending from Maine and Florida to the West Coast and Hawaii. This new acquisition will bring increased service and travel convenience to you as a Phillips credit card holder."

At the time of the Tidewater acquisition, there were approximately 8,000,000 Phillips credit cards outstanding. In addition to encouraging customers to use Phillips' credit card, nationwide marketing eliminates the need for exchange agreements in which other companies honor the credit cards, which usually involve increased costs and losses.

Finally, Phillips realized that entry into California would enhance its opportunities for engaging in crude oil and product exchanges. Most of the vertically integrated oil companies encounter periodic or persistent regional imbalances in their operations—that is, their crude oil production or refinery runs exceed their marketing capacity in a given region, or vice-versa. Hence the firms must transport, purchase, sell or exchange crude oil or refined products in order to bring their regional operations into balance. Since interregional transport is relatively expensive, and outright purchases or sales are subject to the vicissitudes of the marketplace, exchanges among companies are generally the preferred method of adjustment. The ability of a firm to balance its regional output and requirements is increased by its participation in refining and marketing activities in numerous regions.

Another important economic incentive motivating Phillips to enter the California market was to enable it to exploit the crude oil reserves it had been developing in Alaska. Phillips executives regarded the West Coast as the primary market for Alaskan oil production. Phillips had significant crude oil reserves in the Cook Inlet area of Alaska, which it had estimated at the time would provide about 20,000 barrels per day of production by 1970. Large integrated oil companies seek to maintain balance among the various phases of their operations and to derive the full profit potential from each barrel of crude oil through refining and marketing investments. In recent years, improved refinery methods have greatly expanded the quantity of gasoline derived from crude oil.

Still another economic incentive for Phillips to enter California, explicitly recognized by the company's management at the time of the Tidewater acquisition, was the opportunity to enlarge its highly profitable petrochemical business. Phillips is one of the leading oil companies in the petrochemical field, but a crude oil refining operation is needed in order to derive full advantage from many petrochemical processes.

All these objective economic factors were strong incentives for Phillips to seek entry into the California motor gasoline market, whether by unilateral entry or by acquisition. Under the Supreme Court's decisions in *Falstaff, supra,* and *Procter & Gamble, supra,* these objective factors standing alone would compel the conclusion that Phillips was a likely potential entrant prior to its acquisition of Tidewater. The court concludes that not only was Phillips a likely potential unilateral entrant, but it was

the most likely potential entrant, on the basis of the reasons set forth below.

### Feasibility of Entry by Phillips

Given Phillips' capability for unilateral entry into new motor gasoline markets and its strong motivation to enter the California market, it remains to be considered whether there are any unique features of the California market which preclude entry on a unilateral basis. The court concludes that there were no such features of the California market that would have precluded the successful expansion of Phillips into the market on a unilateral basis, as it did in other markets.

First, the entry of Humble Oil & Refining Company into the California market provides evidence of the feasibility of unilateral entry for a company with sufficient capability and motivation, like Phillips. The facts of Humble's entry, *inter alia*, require the court to reject Phillips' contention that there is something so unique about the California market as to preclude substantial entry except by acquiring a going refinery and marketing operation.

Humble, like Phillips, was very interested in entering the California motor gasoline market for several years prior to its actual entry. It regarded California and the West Coast as "the most rapidly expanding economy in the United States today." Like Phillips, its preferred method of entry was by acquisition. In 1957, Humble unsuccessfully attempted to acquire Wilshire Oil Company, a substantial independent California refiner-marketer later acquired by Gulf. Humble then entered the California market in 1960 by acquiring about 30 stations in southern California. In 1961 Humble attempted, again unsuccessfully, to acquire Douglas Oil Company, another substantial independent refiner-marketer in California later acquired by Continental Oil Company. By the end of 1963, Humble had acquired or built approximately 245 stations in California.

Still committed to the goal of substantial entry into the California market by means of acquisition, Humble entered into an agreement in late 1963 to purchase the same Tidewater refining and marketing assets that were later acquired by Phillips. Humble made the same representation to the government in early 1964 that Phillips was later to make concerning its intention not to attempt a substantial entry into California except through a large acquisition. Thus Humble, through its counsel, stated at that time:

> "Humble will not attempt to force its way further into California by a grass roots expansion; if denied the right to consummate the Tidewater acquisition, it will probably withdraw its investment in California as best it can."

Nevertheless, within a few months after Humble had withdrawn from the Tidewater acquisition in the face of an antitrust suit filed by the government, Humble's management embarked upon a long-range, $300 million program of massive unilateral expansion into the California and West Coast markets. While Humble was roughly twice as large as Phillips in terms of domestic assets, its projected expenditures for its unilateral entry were no more than Phillips spent for the Tidewater acquisition. As has been noted, Phillips was well above the minimum size required for substantial unilateral entry.

In April 1967, Humble purchased a number of service stations comprising the Signal Division of Standard Oil Company of California for approximately $40 million. The Signal acquisition was the only significant acquisition by Humble during the 10-year period in which it was making a substantial entry into the California motor gasoline market.

Thus it is clear that as of 1965 and early 1966, substantial unilateral entry into the California market was feasible. Humble did it, and demonstrated, first, that service stations and other retail outlets could be obtained in sufficient numbers to support a substantial entry

into the market without resorting to a major acquisition. Second, Humble's entry demonstrated that California motor gasoline supplies can be obtained in increasingly large amounts and over an extended period of years by means of exchanges and purchases prior to the new entrant's construction and operation of its own West Coast refinery. Humble supplied its growing California requirements entirely through these methods from its entry in 1960 until its refinery at Benecia, California, was operational in 1969. Finally, Humble's entry demonstrated that it is feasible to plan, construct and operate a new refinery in the West Coast in conjunction with a unilateral entry.

Humble's capital investment in its West Coast refining and marketing operations is currently about $380 million, approximately the same as Phillips' investment in the Tidewater acquisition and post-acquisition expenditures. Humble's market share of California tax-paid motor gasoline sales in 1970 was 4.1% as compared with 4.9% for Phillips (or 5.6% including Seaside sales). Humble's net losses before interest and income taxes on its West Coast operations have averaged $6 to $7 million annually between 1966 and 1971, as compared with Phillips' comparable average of about $6 million annually on its West Coast operations. Humble had additional losses of about $4 million per year on its California market operations between 1960 and 1965, but Phillips has paid substantial interest charges on the Tidewater acquisition which have brought its net loss after income taxes and interest to approximately $73 million for the 1966–71 period.

Phillips' higher market share than Humble's may perhaps indicate that a company which makes a given investment can obtain a higher market share through an acquisition than through a unilateral entry, though such a conclusion is purely speculative. The concern of the antitrust laws, however, is not with market shares but with the anti-competitive effects of alternative methods of market entry.

In general, there are four elements central to an analysis of the feasibility of a unilateral entry by Phillips into the California motor gasoline market: (1) the availability of gasoline supplies prior to the construction or acquisition of a West Coast refinery; (2) the availability of marketing outlets; (3) the availability of crude oil supplies for a West Coast refinery; and (4) the feasibility of constructing or acquiring a West Coast refinery. Several of these elements have been discussed above. The court finds that none would have presented an obstacle to Phillips' unilateral entry into California.

Phillips could have supplied itself with gasoline in California until it had its own West Coast refinery through four methods—purchasing the gasoline directly from other oil companies, exchanging gasoline or other products in other parts of the country for West Coast product, having an existing refinery process Phillips' West Coast crude oil, and transporting gasoline to the West Coast from other parts of the country. The evidence establishes that Phillips could probably have obtained an adequate source of supply from any one of these sources alone, and without doubt it could have obtained an adequate supply from a combination of these methods. The court finds that Phillips could have obtained sufficient motor gasoline in California to sustain a unilateral entry.

The experience of Phillips in other markets, and of Humble Oil & Refining Company in California, lends support to this conclusion. Between the end of World War II and 1966, Phillips had successfully expanded into all areas of the continental United States except California. In the course of this expansion, Phillips had supplied itself with motor gasoline through a combination of methods, including exchanges, purchases, direct shipment from existing refineries, and acquisition of older, relatively small refineries. From 1962 to 1966, 29% to

45% of the motor gasoline sold by Phillips through its branded outlets was obtained by exchange, and 24% to 30% came from product purchased from other companies. Humble supported its unilateral entry into the West Coast market with exchanges of gasoline in increasing amounts until its refinery was completed in 1969. The exchanges were for Humble product returned outside the West Coast. Humble received 490 million gallons of gasoline in California by this method between 1965 and 1968, comprising all of its California needs. A commonplace method of obtaining gasoline on the West Coast was through exchanges of product on the West Coast for product delivered elsewhere in the country.

At the time of the negotiations to acquire Tidewater, Phillips became aware of a likely exchange source of gasoline in California that promised to be both large and long-term. An internal Phillips memorandum shows that Mobil was planning to shut down its St. Louis refinery and complete expansion of its Torrance, California refinery in early 1967, and that "Mobil says they would be very much interested in any exchange proposals any company wished to make." A few months after the Tidewater acquisition, another Phillips memorandum reported that Phillips had "discussed with Mobil Oil Company a proposed exchange, East St. Louis versus Torrance, California."

It is likely that Phillips could have also obtained gasoline supplies from both Tidewater and Humble after 1966 had it entered the market unilaterally. Tidewater had excess refining capacity at the time of the acquisition. Humble in 1966 saw itself as having spare refinery capacity on the West Coast after its new refinery at Benecia, California became operational in 1969.

An additional possible source of supply to support a unilateral entry by Phillips was the transport of gasoline from other areas of the country to California. Although the costs involved probably would have made this method the least attractive, it could have been an important supplemental source of supply. Phillips' management knew that other companies operating in California had used this method. For example, Mobil shipped 41 million gallons of its own refined gasoline from Beaumont, Texas to California in 1965; Standard of California purchased and shipped 10 million gallons from Louisiana and Texas to California in 1965; and Texaco shipped 24 million gallons from Texas in 1966. Indeed, Phillips has shipped substantial quantities of motor gasoline from other areas since the Tidewater acquisition in order to supplement its supply from the Avon, California refinery.

Marketing outlets are another important element of a successful unilateral market entry. The court concludes, on the basis of Phillips' demonstrated prior experience in other markets and of Humble's successful experience in California, that Phillips could have obtained adequate marketing outlets to support a successful unilateral entry.

In other markets it had entered, Phillips had no trouble obtaining sufficient marketing outlets. For example, between 1953 and 1956 Phillips created a marketing network of 3,400 outlets in the Southeast and mid-Atlantic areas, where it had never sold before. The company had similar, though somewhat less dramatic, results in other parts of the country. Nationwide, Phillips added 1,200 marketing outlets in 1957; 1,820 in 1959; 258 in 1960; 665 in 1961; and 1,360 in 1962. Humble built up nearly 800 branded outlets of its own in California between 1960 and 1968.

Phillips contends that its experience in other areas is not relevant because "jobbers" are supposedly uniquely unavailable on the West Coast. The argument is without merit. What Phillips refers to as a "jobber" is a contract reseller, of which there are many on the West Coast. Indeed, Phillips' own experience since the Tidewater acquisition has shown that it has relied heavily on contract resellers in increasing its number of service stations in California. In

the two-and-a-half years following the Tidewater acquisition, Phillips acquired 79 California service stations by ownership or leasehold interest. During the same period of time, Phillips obtained 405 additional retail outlets as contract resellers, several of which were large jobbers.

Phillips' capability in expanding its marketing outlets elsewhere and Humble's successful experience in California establish that it was feasible for Phillips to obtain through construction, small acquisitions and attraction of contract resellers, adequate California retail outlets to effect a successful unilateral market entry. In addition, there were opportunities for substantial motor gasoline sales beyond those made through a company's branded retail outlets. Such sales—to large industrial, agricultural, governmental and other retail accounts and to other marketers at wholesale— would enable a unilateral entrant to make a West Coast refinery operational at an earlier date than would otherwise be feasible.

The court finds that Phillips would have been able to obtain sufficient crude oil to supply a West Coast refinery for a unilateral entry into the California market. Phillips could have relied on a combination of company-owned reserves domestic and foreign purchases and exchanges. All of these sources had been used by Phillips in other parts of the country.

Phillips described its crude oil discoveries in Alaska as among the "most significant of our U.S. oil discoveries and field extensions" in its 1965 annual report. The company also reported that a crude oil gathering pipeline had been laid into Cook Inlet in Alaska and that "crude oil sales from Alaskan reserves" were expected to have "a favorable impact on earnings." Phillips was expecting anywhere from 20,000 to 30,000 barrels per day to be produced from its southern Alaskan discoveries, and Phillips' management in 1966–67 was acting on the assumption that Cook Inlet production would be at least 20,000 B/D by

1970. Phillips could also have obtained substantial quantities of crude oil from its Canadian affiliate, Pacific Petroleums. Indeed, a 1963 analysis of methods of supplying a possible refinery in the Puget Sound area projected the use of 24,000 B/D from this source.

Phillips' foreign operations furnished another source of company-owned crude oil available for use in a West Coast refinery. Indeed, since the Tidewater acquisition, Phillips has been transporting 15,000 B/D of its production in Iran to the Avon, California refinery.

An additional method of supplying a refinery was through purchasing a substantial part of Phillips' crude oil needs. Phillips is in fact presently purchasing 55% of the crude oil for its domestic refineries from other companies. Their experience nationally reflects the West Coast experience of most major companies. For example, in the period 1965–68, Mobil purchased from 43% to 60% of the crude oil needed for its Torrance, California refinery, Shell purchased from 42% to 45%, Standard of California from 40% to 50%, Texaco from 15% to 38%, Union from 33% to 43%, Atlantic Richfield from 45% to 58%, Continental from 80% to 88%, and Gulf all of its crude oil supply in 1965 by purchase. Most of these firms have considerably more refining capacity than Phillips would have initially needed to support a unilateral entry. Thus, major oil companies operating on the West Coast have experienced no difficulty in meeting a large part of their demands for crude oil by purchase.

A final source of crude oil recognized by Phillips' management at the time of the Tidewater acquisition was exchanges. Major oil companies on the West Coast have depended on inter-regional exchanges in varying degrees to supplement other sources of crude oil. Two companies, Texaco and Gulf, have utilized exchanges as the major source of crude oil for their California refineries in recent years. Texaco obtained more than 50% of its crude oil requirements in California by exchange for

crude oil returned outside the West Coast during each year from 1965 through 1968, while Gulf traded for between 71% and 92% of its California crude oil requirements between 1966 and 1969.

It is clear that major oil companies have had no difficulty meeting their substantial requirements for crude oil in California in various ways. For a company such as Phillips, with adequate domestic and foreign crude production of its own economically available to a company-built West Coast refinery, and with additional crude oil available if needed through purchase, exchange and transport from other areas, the supplying of a new refinery in connection with unilateral market entry could have posed no problem.

The court concludes that Phillips could have constructed a refinery on the West Coast that would have supported a successful unilateral entry into the California motor gasoline market. The minimum feasible size for a refinery to support a major market entry would have been approximately 50,000 B/D. Phillips' financial resources, experience in other markets, and Humble's experience in California all point to the conclusion that Phillips possessed the capability to construct such a refinery on the West Coast. Humble's Benecia, California refinery, completed in 1969, had an initial capacity of 72,000 B/D and has since been expanded to 86,000 B/D. Moreover, there were a number of small and medium-sized refineries on the West Coast during the 1965–70 period that could have been acquired by Phillips and then expanded or renovated in the context of a primarily unilateral market entry.[9]

In sum, the court concludes that a unilateral market entry by Phillips into the California motor gasoline market would have been feasible.

## A Concentrated Market

Consistent with its approach of "dispensing . . . with elaborate proof of market structure, market behavior, or probable anticompetitive effects" in § 7 cases, United States v. Philadelphia National Bank, *supra*, 374 U.S. at 363, 83 S.Ct. at 1741, the Supreme Court has relied increasingly on evidence of market concentration for "an inference that the effect of [an acquisition] may be substantially to lessen competition." *Id.*, at 365, 83 S.Ct. at 1742. As recognized by the Court, such an approach "is fully consonant with economic theory. That '[c]ompetition is likely to be greatest when there are many sellers, none of which has any significant market share,' is common ground among most economists." *Id.*, at 363, 83 S.Ct. at 1741. Such reliance reflects the "dominant theme" of § 7 as amended, "a fear of what was considered to be a rising tide of economic concentration in the American economy," Brown Shoe Co. v. United States, *supra*, 370 U.S. at 315, 82 S.Ct. at 1518. This concern has been manifested in the prohibition of mergers which create "undue concentration," United States v. Philadelphia National Bank, *supra*, 374 U.S. at 364, 83 S. Ct. 1715; further a trend toward concentration, United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); United States v. Von's Grocery Co., *supra*; Brown Shoe Co. v. United States, *supra*; or prevent the possibility of future market deconcentration, United States v. Aluminum Co. of America, *supra*. Testimony at trial indicated that there is a very close connection between the structure of a market and the behavior of the firms in the market.

At the time of the Tidewater acquisition, the seven established major oil companies in the California market— Standard of California, Shell, Union, Richfield, Mobil, Texaco and Tidewater

9. In 1970, Gulf acquired a 20,000–30,000 B/D refinery at Hercules, California from Sequoia Refining Company. In the same year, Signal Oil & Gas Company sold its modern-ized 24,500 B/D refinery at Bakersfield to Toscopertro Corporation. Both refineries manufactured high-quality motor gasoline.

—accounted for 83% of California refining capacity and 81% of tax-paid gasoline sales. The top four California firms had 61% of California refining capacity and 58% of gasoline sales. The level of concentration was higher than in most other regional petroleum markets in the United States.

The above figures may actually underestimate the major companies' dominance in the California market. The vertical integration characteristic of the industry results in the same firms being dominant in refining, marketing and crude oil production in California.

The California motor gasoline market is "highly concentrated" on the basis of the criteria applied by the Supreme Court. In *Aluminum Co. of America, supra,* 377 U.S. at 278, 84 S.Ct. 1283, the Court characterized the relevant market as "highly concentrated" where the top five firms accounted for 65.4% of the market and the top nine controlled 88.2%. Previously, in United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 605 (S.D.N.Y.1958), cited approvingly in *Brown Shoe, supra,* 370 U.S. at 322 n. 38, 82 S.Ct. 1502, a market was viewed as "already highly concentrated" where the top eight firms controlled 77% of the market and the top four firms held 59%. The Supreme Court's characterization of highly concentrated markets is consistent with that employed by leading economists. Kaysen and Turner, for example, define a "tight oligopoly" as one having a "very small number (eight or fewer) firms supplying 50% of the market, with the largest firm having a 20% or higher share." Kaysen & Turner, Antitrust Policy 72 (1959).

The California market for motor gasoline sales in 1965 was more highly concentrated than in 1960. The seven largest companies increased their share of motor gasoline sales from 79% in 1960 to 81% in 1965. The four largest increased their shares from 52% in 1960 to 58% in 1965, while the shares of the two largest increased from 32.5% in 1960 to 39% in 1965.

Since 1965, however, there has been some degree of deconcentration in the market. The market share of the seven largest marketers declined from 81% in 1965 to 75% in 1971, while that of the ten largest decreased from 92% in 1965 to 87% in 1971. The share of the market leader, Standard of California, declined from 23% in 1965 to 16% in 1971, with about 2.5% of this decrease attributable to the sale of its Signal brand stations to Humble Oil & Refining Company in 1967. Shell overtook Standard of California as the leading seller in California.

In the seven years prior to the Tidewater acquisition, five new majors (Humble, Gulf, Continental, American and Atlantic) and one large independent (Signal Oil & Gas) entered the market unilaterally or through acquisitions of small companies. Humble, Gulf, and Continental, the largest of the new majors, increased their market shares collectively by 4.3% in the period 1960–65, with Humble accounting for most of this increase.

Since 1965, the share of the market held by independents as contrasted with that held by the major, fully integrated companies has remained relatively stable at about 12%. Until the recent departure of Signal Oil & Gas Company from the California market, it and the other leading independent, Powerine Oil Company, accounted for about 50% of the independents' share.

In United States v. Von's Grocery Co., *supra,* the Supreme Court held that a horizontal merger of the third and sixth largest firms in the relevant market, resulting in the merged company's having the second largest market share (7.5%), was illegal under § 7. The Court emphasized that the number of competitors in the market had declined from approximately 5300 to approximately 3800 over the preceding 10 years, in large measure through acquisitions.

In United States v. Pabst Brewing Co., *supra,* the tenth and eighteenth largest sellers in the market, with 3% and 1.5% of the market respectively,

merged, forming the fifth largest seller with 4.5%. There had been a trend toward concentration in the market, with the number of breweries declining appreciably over a 10-year period. The 10 leading companies had increased their market shares from 45% to 53% over four years. While the market was still not highly concentrated, it was becoming increasingly concentrated and was heading toward an oligopoly. The Court held that a trend toward concentration "is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be," 384 U.S. at 553, 86 S.Ct. at 1669, and held the merger to be illegal.

In United States v. Jos. Schlitz Brewing Co., 253 F.Supp. 129 (N.D.Calif.), aff'd, 385 U.S. 37, 87 S.Ct. 240, 17 L. Ed.2d 35 (1966), the court held that in an industry where there was a trend toward concentration and high barriers to entry, the elimination of potential competition made the merger illegal under § 7. The companies that merged were the second and fourteenth largest in the nation, with 8.3% and 2.1% of the market, respectively, and the merged company would have ranked first in the nation, with a 10.4% market share. There was a trend toward concentration, with the number of companies decreasing and the shares of the 10 largest companies increasing.

The issue of market concentration was dealt with in the majority and concurring opinions in United States v. Falstaff Brewing Corp., *supra*. The majority recognized the primary importance of concentration data in analyzing the anticompetitive effect of an acquisition under § 7:

> "While beer sales in New England increased approximately 9.5% in the four years preceding the acquisition, the eight largest sellers increased their share of these sales from approximately 74% to 81.2%. In 1960, approximately 50% of the sales were made by the four largest sellers; by 1964 their share of the market was 54%; and by 1965, the year of acquisition, their share was 61.3% . . . . ."

The evidence regarding the degree of concentration of the California motor gasoline market reveals an even greater level of concentration and a more pronounced trend toward concentration at the time of the Tidewater acquisition than in *Falstaff*. Motor gasoline sales in California increased approximately 26% in California during the five years preceding the Tidewater acquisition (1960–65). The seven largest sellers increased their share of the market from 79.2% to 81.2%. In 1960, approximately 52% of the sales were made by the four largest motor gasoline sellers, but by 1965 their share was 58%. Moreover, the two dominant marketers in California (Standard of California and Shell) increased their combined market share from 32.5% in 1960 to 39% in 1965.

Justice Marshall, in his concurring opinion in *Falstaff*, stated the "the New England market is highly concentrated," 410 U.S. at 571, 93 S.Ct. at 1120. The California motor gasoline market in 1965–66 must be considered to be at least as highly concentrated. While Justice Marshall noted that "the concentration of the market does not yet seem to have produced blatantly anticompetitive effects . . . prices have remained fairly stable despite rising costs and competition seems relatively intense among the few large firms which dominate the market," he nevertheless observed that the concentration data in the record revealed that "the seeds of anticompetitive conduct are present, since '[a]s [an oligopolistic] condition develops, the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge.' United States v. Aluminum Company of America, 377 U.S. 271, 280, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964)." 410 U.S. at 550, 93 S.Ct. at 1110.

*Barriers to Entry and the Paucity of Other Likely Unilateral Entrants*

There were extremely high barriers to entry into the California motor gasoline market which restricted the number of potential entrants and constituted an important reason for the high degree of concentration in the market. Testimony at trial established the approximate investment cost for a unilateral entry into the market in 1966 at roughly $356 million, consisting of $100 million for a 50,000 barrel per day refinery, $156 million for 125 service stations per year for 10 years, $25 million for after-tax losses over the first 10 years, $50 million for working capital and ancillary equipment, and $25 million as a contingency item to cover inflation.

Of the 19 largest domestic oil companies, eight were not in the California motor gasoline market as of the end of 1965. Phillips was by far the largest of the majors not in California at that time. Four of the companies not in California had assets of well under $1 billion. It is unlikely that any of those four companies would have entered the market unilaterally in 1966 or shortly thereafter; while they might conceivably have been able to raise the required financing and proceed with a unilateral entry, doing so would have severely taxed their financial resources.

Three firms with assets exceeding $1 billion in value, other than Phillips, were not in California. These were Sinclair, Cities Service, and Sun, all of which were much larger than the four firms with assets under $1 billion. Next to Phillips, Sinclair was the largest oil company not in the California market, but could not have been considered a likely potential unilateral entrant in early 1966 because of financial considerations. Its debt-equity ratio of .39, substantially higher than Phillips' .26 ratio, put Sinclair in a precarious position were it to undertake substantial additional debt financing. Sinclair's rate of return on its common equity was only 7.3%, compared with Phillips' 10.1%,

which made Sinclair even less able to absorb new debt. Finally, Sinclair's 10-year growth rate was only 1.4% per year, compared with Phillips' 3.7%.

After Phillips and Sinclair, the largest of the majors not in California was Cities Service, which had a somewhat less desirable debt-equity ratio than Phillips. Cities Service's record of expansion of petroleum product sales has been poor; between 1957 and 1966 it achieved zero growth. Cities Service's marketing area in 1965 was much smaller than either Phillips' or Sinclair's, and it therefore had large unexploited abutting markets to develop outside the West Coast. Since 1965, Cities Service has retrenched its marketing area by selling its midwestern marketing assets to Gulf. Both Cities Service's financial position and the high financial risk implicit in its poor record of marketing expansion made it a much less likely substantial unilateral entrant into California than Phillips in 1966.

The third of these companies, Sun Oil Company, in 1966 was both significantly smaller and had a poorer profit record than Phillips. Most importantly, Sun was only an East Coast marketer and had a poor record of expansion into other market areas. The probability in 1966 that Sun might enter the California market was therefore significantly smaller than the probability that Phillips would enter.

These economic factors serve to demonstrate that in addition to being a potential unilateral entrant into the California motor gasoline market, had it not acquired Tidewater, Phillips in 1966 was the most likely potential entrant into the market. See FTC v. Procter & Gamble Co., *supra*, 386 U.S. at 580–581, 87 S.Ct. 1224, 18 L.Ed.2d 303; United States v. El Paso Natural Gas Co., *supra*.

*The Edge Effect and Industry Recognition of Phillips as a Potential Entrant*

Phillips contends that the court should find that it did not exert a substantial effect upon competition in the market

from its position at the edge of the market because:

"Looking at the realities and practicalities of the California motor gasoline market, no reasonable man could conclude that the existence of Phillips across the mountains could have any effect whatever on competition within the market. And there is no evidence to support any such conclusion. Despite the fact that the oral depositions of seven industry witnesses, unconnected with Phillips or Tidewater, were taken in this action, and written depositions as well were taken of every west coast major, not one witness or Company was ever asked by the Government whether he or his company had ever given any thought to the possibility of Phillips' entry in making any marketing, pricing, or other business decision." Defendant's brief at 147.

Phillips' contention that there is no evidence showing that it exerted an edge effect upon competition in the marketplace is simply not true. There is a multitude of evidence that other companies regarded Phillips as a potential entrant and that Phillips' presence on the edge of the market exerted a substantial procompetitive effect upon competition in the market which was eliminated by the Tidewater acquisition.

In *Falstaff*, the Supreme Court stated than an acquisition "becomes suspect under § 7" if it would appear to "rational" competitors in the market that "Falstaff might well build a new brewery to supply the northeastern market." 410 U.S. at 533, 93 S.Ct. at 1101. Industry recognition of an on-the-fringe potential entrant is a key factor in attributing to it significant "likely influence on existing competition." *Id.*, at 534, 93 S.Ct. 1096. Such industry recognition may, of course, be shown by direct evidence as well as by inference from the objective economic facts establishing likelihood of market entry. The voluminous objective economic evidence establishing Phillips as a likely unilateral entrant with the capability and motivation to en-ter the market has been detailed above. This evidence alone would be sufficient to establish the existence of a substantial procompetitive effect upon competition exerted by Phillips from the edge of the market. In addition, there was direct evidence that Phillips was regarded as a potential entrant by companies in the California market at the time of the Tidewater acquisition.

First, Standard of California prepared a careful analysis in late 1965 of potential buyers of the Signal Oil Division of its Western marketing operations. The companies analyzed as "Potential Acquiring Companies" were Humble, Standard of Indiana (American), Phillips, Signal Oil & Gas Company and British Petroleum. Humble, Indiana Standard and Signal Oil & Gas were all in the California market at the time. The California Standard analysis concluded that BP could not seriously be regarded as a prospective purchaser because of its lack of United States tax offsets: "On this analysis BP could not afford to pay anything since it has been assumed that they would have no way in which to offset U. S. refining/marketing losses against other income." The analysis therefore concluded that Phillips was the most likely purchaser among companies not already in the market. It was further concluded, on the basis of analysis, that it would be feasible for Phillips to build a California refinery to supply the stations. This, in itself, makes the Tidewater acquisition "suspect" under the standard laid down in *Falstaff*; Falstaff's entry into the New England market by merger would be "suspect under § 7" if it would appear to "rational" competitors in the market that "Falstaff might well build a new brewery to supply the northeastern market." 410 U.S. at 533, 93 S.Ct. at 1101.

Second, there was direct evidence showing that Phillips was viewed as a potential entrant by Tidewater itself. Tidewater prepared a detailed analysis of its West Coast operations in late 1965, prior to its negotiations with Phillips concerning the sale of its refining

and marketing assets. This analysis cited Phillips as a potential competitor which might contribute to downward pressure on product prices. The study also indicated that Tidewater, in planning its future strategy, predicted and was concerned with the future plans of its competitors. Thus, as in *Procter & Gamble, supra,* 386 U.S. at 581, 87 S.Ct. at 1231, "market behavior of the . . . industry was influenced by each firm's predictions of the market behavior of its competitors, actual and potential." The Tidewater analysis is probative of the beneficial effect upon competition exerted by Phillips from its position on the edge of the market prior to the Tidewater acquisition.

Third, in June 1965 Union Oil Company transmitted a memorandum to the Antitrust Division of the Department of Justice concerning Union's efforts to expand refining and marketing activities eastward from the West Coast. The memorandum argued that there was a "movement" afoot whereby "other large marketers have been penetrating the West Coast from neighboring regions." The analysis contained a table showing market shares in the "PACIFIC COAST STATES," including a group of five companies identified under the heading *"Entering Large Majors"*: Gulf, Continental, Humble, Phillips, and Standard of Indiana. This listing further demonstrates the edge effect that Phillips exerted on Union, since, as the Union memorandum pointed out, "[t]hese trends have given Union increasing concern."

In the years preceding the Tidewater acquisition, Phillips engaged in a well-publicized effort to gain control of Union Oil Company and had also conducted merger discussions with Richfield Oil Corporation. In this connection, the Supreme Court in *Falstaff* specifically alluded to the fact that Falstaff "had . . . made its interest known by prior acquisition discussions" as part of the circumstantial evidence of its on-the-fringe impact on the market. Moreover, Phillips had contacted virtually every West Coast refiner about obtaining gasoline supplies there in sufficient volumes to support a marketing entry.

Not surprisingly, particularly in view of the aggressive manner in which Phillips was entering the Southeastern and East Coast gasoline markets at the time, the West Coast refiners approached by Phillips were less than enthusiastic about supplying Phillips with exchange gasoline. Kyser, the former Phillips supply and transportation official, testified that Phillips was unable to obtain an exchange agreement on the basis it desired (one starting at a relatively low volume and steadily increasing), and attributed this partly to the fact that the company had "tread on some toes" while expanding its marketing area in the East. In other words, Phillips' aggressive eastward expansion had so shaken the West Coast majors that they recoiled from the prospect of assisting Phillips' unilateral entry into their market. They were, of course, reacting strongly to Phillips' presence on the edge of the market as a potential competitor.

It would be difficult to imagine stronger direct evidence showing industry recognition of a company as a significant potential market entrant. In effect, Phillips had notified the entire West Coast oil industry that it was a serious potential entrant.

It is therefore clear from the evidence of record that Phillips was precisely the kind of significant "potential competitor on the fringe of the market with likely influence on existing competition" that the Court described in *Falstaff,* 410 U.S. at 534, 93 S.Ct. at 1101. The elimination through the Tidewater acquisition of the substantial procompetitive effect on competition in the market exerted by Phillips from the edge of the market renders Phillips' entry into the California market by means of the Tidewater acquisition illegal under § 7, independent of any other reason.

*Substantiality of Anticompetitive Effect*

The objective evidence of record concerning Phillips' capacity and motivation

to enter the market unilaterally, Phillips' status as the most likely potential entrant, the small number of other potential entrants, the feasibility of unilateral entry by Phillips, and the concentrated nature of the market are legally sufficient to establish that Phillips' entry into the market through the Tidewater acquisition had substantial anticompetitive effects. It must necessarily be assumed that the entry of an aggressive major company such as Phillips into such a market on a unilateral basis would have conferred substantial competitive benefits which were lost when it was allowed to step into the shoes of an established major factor in the market. The substantiality of the anticompetitive effects of the Tidewater acquisition may be inferred from the objective facts present here.

A unilateral entrant would have been an addition to the number of competitors in the concentrated market instead of a mere replacement of an existing competitor, and would have been compelled to seek its place in the market at the expense of established competitors rather than by inheriting a substantial market position. The procompetitive benefits which would have been realized had Phillips entered the market unilaterally are of several kinds. First, price competition would have been enhanced by the unilateral entry of a major company, as well as competition with respect to services and quality of product. Price competition would not have been limited to that which the new entrant provides through its own branded outlets. A highly important consideration is the additional industry refining capacity which is created by the unilateral entry of a new major company. Increased capacity tends to make increased product supplies available to marketers generally, particularly to small independent marketers lacking their own refining facilities who may be "squeezed" in periods of tight supply.

An independent entry by Phillips would have conferred substantial competitive benefits not only by increasing the number of competitors but also by virtue of the impact on the market caused by the entering firm's struggle to obtain a market share at the expense of the other firms in the market. The court agrees with the testimony at trial that "an aggressive marketer entering a market has a very real impact on that market" which is largely forfeited when it is allowed to step into the shoes of another major company in the market because

> "if a . . . major firm, acquires another major firm in the market, . . . it is . . . not under the compulsions to aggressively develop its market in that area. . . . [The] competitive effect of a firm that enters the market on an essentially grass roots basis is very great indeed relative to one which just acquires another major. . . ."

In addition to the substantial procompetitive benefits that would have resulted in the marketplace from a future unilateral entry by Phillips, the objective evidence demonstrates the substantiality of the procompetitive effect exerted by Phillips from its position on the edge of the market prior to the acquisition. A significant potential entrant on the fringe of a concentrated market, as Phillips was prior to the Tidewater acquisition, is likely to exert a substantial beneficial effect upon competition in the market simply because of its potential for unilateral entry. The Supreme Court has emphasized that this aspect "cannot be underestimated," *Penn-Olin, supra*, 378 U.S. at 174, 84 S. Ct. 1710. Whether or not it can be shown that specific actions of companies in the market have been influenced by the presence of the potential entrant on the fringe, it must be assumed that such influence exists where the market is concentrated. In this case, there was direct evidence of Phillips' substantial on-the-fringe impact upon competition.

### The Tidewater Acquisition Was Not a "Foothold Acquisition"

 A "foothold" or "toehold" acquisition may be defined as one which is sufficient to assist the potential entrant over the entry barriers and into the market, but not so large that the entrant merely replaces the acquired company; the acquiring company must have a substantial need to build upon the acquisition. Such a foothold acquisition is fully consistent with the concept of unilateral entry, since both envision a significant market-penetration effort by the entering company quite apart from whatever assets or market position have been acquired. In contrast to an independent unilateral entry, however, the foothold acquisition normally entails the elimination of a significant independent factor in the market. For this reason, the foothold acquisition cannot be looked upon with favor unless it is not only a foothold from which to achieve a substantial market entry, but is also necessary to such market entry—that is, unless the potential entrant could not have achieved a substantial market entry on a unilateral basis, perhaps supplemented only by incidental acquisitions of a *de minimis* nature. Here, however, the evidence clearly establishes the feasibility and likelihood of unilateral entry by Phillips into the California motor gasoline market.

A majority of the Supreme Court in *Falstaff* implicitly accepted the "toehold" acquisition concept as being consistent with unilateral market entry. Thus, the Court noted, after stating the government's contention that Falstaff might have entered the New England market *de novo* "or by acquisition and expansion of a smaller firm, a so-called 'toe-hold' acquisition," that "[h]ereinafter, reference to *de novo* entry includes 'toe-hold' acquisition as well." 410 U.S. at 530 and 530 n. 10, 93 S.Ct. at 1099.

 Phillips' acquisition of Tidewater cannot be considered a "foothold" acquisition because of the size and market

share of the acquired company. An acquisition of a company which ranks seventh in a concentrated market, holding a 6–7% share of the market, is simply not small enough to constitute a mere "foothold" acquisition. Moreover, Phillips did not use Tidewater as a small base from which to expand its operations and did not have a substantial need to build upon the acquisition, but instead used Tidewater's assets as the major element of its market entry.

For these reasons, Phillips cannot rely as a defense against this antitrust action that its acquisition was merely a "foothold" one.

### Tidewater Was Not a "Failing Company"

Tidewater, like Phillips, has offered subjective evidence of management intent as a defense to the § 7 action. Tidewater's president, George F. Getty II, testified that it was his "intention" in 1966 to have Tidewater go out of business as a West Coast refiner-marketer within one year, by selling and disposing of assets piecemeal in the event that the sale to Phillips collapsed for any reason.

 Tidewater contends as a defense to this action that since it would have gone out of business on the West Coast anyway, the acquisition of its assets by Phillips did not result in any anticompetitive effect in the market—Tidewater was planning to go out of business anyway. This contention must fail because the reason for, or the circumstances leading to, an acquisition are irrelevant in determining whether § 7 has been violated. Section 7 is concerned only with the effect upon competition of an acquisition, and the statutory language was carefully drafted to refer only to an acquisition's effect. If the acquisition has a substantial anticompetitive effect, it is illegal under § 7. With reference to the antitrust laws, unless the seller objectively comes within the "failing company" doctrine, it is irrelevant why one corporation sells its assets to another. The issue in an anti-

trust case is not a determination of the reasons for selling, but only the anticompetitive effect of the sale.

A second reason for rejecting Tidewater's contention that the acquisition does not violate § 7 because Tidewater would have gone out of business is that this argument focuses only on Tidewater, not on Phillips. It may well be that Tidewater could have sold its assets to other, smaller companies with less severe anticompetitive effects than those entailed by their sale to Phillips. Phillips, however, could have entered the market by an alternative means—unilateral entry—that would have had a substantial procompetitive effect upon the marketplace, especially in comparison to Phillips' entry by acquisition. Moreover, the substantial procompetitive edge effect exerted by Phillips prior to the acquisition was eliminated when Phillips entered the market by acquiring the Tidewater assets.

The only reason for selling which would balance out against the anticompetitive effects here would be a showing by objective evidence that Tidewater qualified as a "failing company." The failing company defense to a § 7 action was first enunciated in International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930), and is based upon the proposition that if "at the time of the acquisition the financial condition of the . . . [acquired company] was such as to necessitate liquidation or sale, . . . the prospect for future competition or restraint was entirely eliminated." Id., at 294, 50 S.Ct. at 90. In other words, if there were no prospect that the acquired firm could continue competing in the market, it would have been eliminated as a competitive force whether or not it was acquired by the acquiring company. In International Shoe, the company found to be "failing" was

"a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where its plants were operated. . . ." 280 U.S. at 302, 50 S.Ct. at 93.

In Brown Shoe, supra, 370 U.S. at 319, 82 S.Ct. at 1521, the Supreme Court characterized a failing company as "one which no longer can be a vital competitive factor in the market." Not surprisingly, few companies have been found to be "failing" on the basis of this rigid test.[10] The failing company in United States v. Maryland & Virginia Milk Producers Association, 167 F.Supp. 799 (D. D.C.1958), aff'd, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), was found to be "hopelessly insolvent." And in Citizen Publishing Co. v. United States, 394 U.S. 131, 138–139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969), the Court stated, "The prospects of reorganization of the Citizen in 1940 would have had to be dim or nonexistent to make the failing company doctrine applicable to this case."

The criteria for establishing a failing company defense manifestly are not met by Tidewater. Tidewater as a whole had returned a net income of $192 million in the five years prior to the acquisition, including $56.5 million during 1965. Its integrated western operations (marketing, refining, production and transportation) were also profitable, having earned aggregate net income of $78 million during the five years prior to the acquisition, including $25.7 million in 1965. Even considering the re-

---

10. Mergers were justified on failing company grounds in United States v. Maryland & Virginia Milk Producers Ass'n, supra, and in International Shoe Co. v. FTC, supra. Failing company defenses were rejected in the following cases, among others: United States v. Greater Buffalo Press, 402 U.S. 549, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971); Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); United States v. Third National Bank in Nashville, supra; United States v. El Paso Natural Gas Co., supra; United States v. Von's Grocery Co., supra; United States v. Philadelphia National Bank, supra, and United States v. Jos. Schlitz Brewing Co., supra.

fining and marketing assets sold to Phillips separately, which is somewhat unrealistic in terms of the economics of the oil industry since they were part of Tidewater's integrated western operations, no failing condition was present. True, in some years losses had been experienced by Tidewater's Western Marketing and Manufacturing Division, and its position as a California motor gasoline marketer had declined during the 1960–65 period in terms of market share, number of retail outlets, and branded sales. However, in the year prior to the sale of these assets to Phillips, they earned a net income of $5.1 million. In addition, they earned a net income of $2.2 million during the first half of 1966 even though there was a slight loss in the second quarter of that year, following the formal approval of the acquisition agreement with Phillips. In short, Tidewater was a viable company—overall, on the basis of its integrated western operations, or on the basis of its western marketing and refining operations considered separately.

The law is clear that evidence of a decline in market position and varying profits and losses cannot be elevated to the status of a "failing company" by subjective statements of management intention or desire to go out of business if the acquisition had not taken place. This is particularly true when other possibilities of selling the assets in question, more consistent with the policy of the antitrust laws, have not been fully explored.

For these reasons, Tidewater's "failing company" defense must be rejected.

### Evidence of Post-Acquisition Losses

The defendants point to losses suffered by Phillips since the Tidewater acquisition in support of their contention that Phillips would not have entered the market unilaterally if it had been denied the Tidewater acquisition. Tidewater's brief states:

"Phillips has lost money every year in manufacturing and marketing in California, although it has poured in millions into the refinery and marketing since the Transfer Date. Apart from the tankers, it had lost up to the time of trial $76,000,000 from the operation of the acquired assets."

Evidence of post-acquisition losses cannot legalize or validate an acquisition otherwise illegal under § 7. To begin with, Phillips executives indicated their view at trial that the company's profit situation would turn around within three years. Second, while post-acquisition evidence of the effect of a merger or acquisition upon competition is relevant in determining whether a merger violates § 7, it must not be "given conclusive weight or allowed to override all probabilities," FTC v. Consolidated Foods Corp., 380 U.S. 592, 598, 85 S.Ct. 1220, 1224, 14 L.Ed. 2d 95 (1965). "[T]he force of § 7 is still in probabilities, not in what later transpired. That must necessarily be the case, for once the two companies are united no one knows what the fate of the acquired company and its competitors would have been but for the merger." Id.

In FTC v. Procter & Gamble Co., supra, the Supreme Court held that the Court of Appeals had erred in relying heavily upon post-acquisition evidence in support of its determination that the acquisition in that case did not violate § 7. The Court pointed out that:

"Section 7 of the Clayton Act was intended to arrest the anticompetitive effect of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. The section can deal only with probabilities, not certainties. . . . If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." 386 U.S. at 577, 87 S.Ct. at 1229. (Citations omitted.)

In United States v. du Pont & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), the Supreme Court held that the test of legality of a stock acquisition under § 7 is whether, *at the time of suit*, there is a reasonable probability that the acquisition may lead to a restraint or a monopoly. The government was allowed to maintain a suit brought in 1949 based upon a stock acquisition in 1917–19. The Court stated:

> "Section 7 is designed . . . to arrest in their incipiency restraints or monopolies in a relevant market which, as a matter of reasonable probability, *appear at the time of suit* likely to result from the acquisition. . . ." 353 U.S. at 589, 77 S.Ct. at 875. (Emphasis added.)

In *Penn-Olin, supra,* 378 U.S. at 168, 84 S.Ct. at 1716, the Court stated:

> "Penn-Olin was engaged in commerce at the time of suit and the economic effects of an acquisition are to be measured at that point rather than at the time of the acquisition."

▬▬ Thus, while post-acquisition evidence is relevant, the legality of an acquisition under § 7 must be determined on the basis of objective evidence of conditions as they existed at the time of suit. Post-acquisition evidence may be helpful in illuminating or filling in details where it is difficult to evaluate the probabilities at the time of suit. But in the face of a clear probability of a substantial anti-competitive effect existing at the time of suit, a merger or acquisition must be held to be illegal under § 7, regardless of what happens at a later date. To hold otherwise would permit a patently illegal merger to be legalized at some later date by the occurrence of fortuitous circumstances. Such an interpretation is necessary to provide predictability to businessmen in the planning and conduct of business activities.

### Tidewater Is a Proper Party

▬▬ Tidewater contends that it, as the seller of the acquired assets, is not a proper subject of a suit under § 7. This contention must be rejected.

In United States v. du Pont & Co., *supra,* the Supreme Court reversed and remanded the district court's dismissal of the goverment's complaint charging du Pont, General Motors, Christiana Securities Corporation and Delaware Realty & Investment Company with violating § 7 of the Clayton Act because du Pont held 23% of the stock of General Motors. Christiana and Delaware were holders of large amounts of the corporate stock of du Pont and had made no acquisition of General Motors stock. The Court remanded the case for "a determination, after further hearing, of the equitable relief necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute," 353 U.S. at 607, 77 S.Ct. at 885 and stated further:

> "The motion of the appellees Christiana Securities Company and Delaware Realty and Investment Company for dismissal of the appeal as to them is denied. It seems appropriate that they be retained as parties pending determination by the District Court of the relief to be granted." *Id.,* at 608, 77 S.Ct. at 885.

On remand, United States v. du Pont & Co., 177 F.Supp. 1 (N.D.Ill.1959), vacated on other grounds, 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961), the issue of the power of the district court to grant relief against the non-acquiring companies (General Motors, Christiana and Delaware) was raised. As to General Motors, the court ruled:

> "The authority of the Court in this case is derived from Section 15 of the Clayton Act, 15 U.S.C.A. § 25, which clothes the Court with all the historical powers of a court of equity. The Supreme Court has held [in the same case] that in framing equitable decrees under the antitrust laws District Courts are given 'large discretion to model their judgments to fit the exigencies of the particular case.' The Court is of the opinion that in a proceeding under Section 7 of the Clayton

Act in which it has been found that the acquisition of stock by one corporation in another violates the statute, a court of equity has power to grant such relief against the corporation whose stock has been acquired as may be necessary and appropriate in the public interest to eliminate the effects of the acquisition which have been held to be offensive to the statute." 177 F.Supp. at 11.

As to Christiana and Delaware, the court held:

"In the exercise of its authority the Court could enter a judgment which directly and substantially affects the rights and interests of Christiana and Delaware even though they have not been found guilty of violating any law. It follows . . . that this Court may grant certain kinds of ancillary relief against these two corporations, not because they have violated the statute but because the granting of the relief is an appropriate and necessary exercise of the power of this Court to frame a judgment which will effectively dissipate the consequences of the stock acquisitions found to be unlawful." *Id.*, at 11–12.

In United States v. Pabst Brewing Co., 183 F.Supp. 220 (E.D.Wis.1960), a case involving an acquisition of assets, the government joined the acquiring company and the acquired company as defendants, but charged a violation only against the acquiring company. When the acquired company moved for dismissal, the court held that even though the complaint did not charge it with a violation, it was a proper party:

"In a proceeding under § 7 of the Clayton Act, the court has authority to grant relief not only against parties who are found to have violated that section, but also against other parties if such relief is necessary to eliminate the effects of an acquisition offensive to the statute. . . . All parties against whom relief may be granted may properly be joined as parties defendant." 183 F.Supp. at 221.

In order to fashion appropriate relief in accordance with its equity powers, the court deems it necessary to include Tidewater as one of the parties against whom relief may be granted, and Tidewater is therefore a proper party to this action.

### Form of Relief

Divestiture has become the normal form of relief when acquisitions have been found to violate Section 7 of the Clayton Act, *see* United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316 at 328–330, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961), and in its judgment the court will order divestiture.

However, a plan of divestiture is one which must be carefully considered. For example, the court must take notice of the fact that the petroleum energy supplies and demands are much different today than they were at the date of the acquisition. Furthermore, a divestiture plan to be approved by the court must take into account the fact that an important element of competition in the sale of gasoline in California has been the ability of independent marketers to obtain an adequate source of supply of gasoline.

Accordingly the court will retain complete jurisdiction over all the parties for all purposes specifically including the issuance of further orders as may be necessary to eliminate the anticompetitive effect of the Tidewater acquisition by Phillips.

### Judgment

It is the judgment of this court and the same is directed to be prepared separately and entered under Rules 58 and 79 of the Federal Rules of Civil Procedure as follows:

It is adjudged and decreed:

1. That the acquisition of the Western Manufacturing and Marketing Division of the Tidewater Oil Company by Phillips Petroleum Company is in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

2. Phillips Petroleum Company is directed to divest itself of such assets so acquired as are necessary to eliminate the violation of Section 7 and to comply with all other orders of the court directed to it which are necessary to eliminate the violation of Section 7.

3. Tidewater Oil Company is directed to comply with all orders of the court directed to it which are necessary to eliminate the violation of Section 7.

4. The defendants are directed to lodge with the court within 90 days from the date this judgment becomes final plans for divestiture which shall provide for the elimination of the violation of Section 7.

5. Divestiture shall be in accordance with such orders as the court directs.

6. The court retains full and complete jurisdiction over the parties with reference to the action to make such orders as may be necessary to carry out the judgment and for all other purposes specifically including the jurisdiction to modify and amend this judgment for the purpose of eliminating the violation of Section 7.

7. The plaintiff shall recover its costs of this action.